Below is an Opinion of the Court.

_____
ELIZABETH PERRIS
U.S. Bankruptcy Judge

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In Re: | ) Bankruptcy Case No. |
| | ) 09-30508-elp11 |
| CASCADE GRAIN PRODUCTS, LLC, | ) |
| | ) MEMORANDUM OPINION RE MOTION FOR |
| Debtor. | ) APPROVAL OF SETTLEMENT |
| | ) |

Debtor Cascade Grain Products, LLC ("debtor") seeks bankruptcy court approval of its settlement with Berggruen Holdings Ltd. ("Sponsor") and its pre-petition lenders ("Loan Creditors"). The United States Trustee ("UST") and creditor JH Kelly, LLC, Ethanol ("Kelly") object.

Debtor, the Sponsor, and the Loan Creditors have disputes relating to the Sponsor Contingent Equity Support Agreement ("Sponsor Support Agreement") entered into prepetition by debtor, the Sponsor, and the Loan Creditors, as an inducement to get the Loan Creditors to provide debtor with financing. Under the Sponsor Support Agreement, the Sponsor agreed under certain circumstances to make contributions to cover specified

Page 1 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

shortfalls in debtor's financial ability to build and operate an ethanol plant. The settlement resolves those disputes among the three parties, and helps pave the way for debtor to obtain confirmation of its chapter 11[1] plan of reorganization.

The proposed settlement requires the Sponsor to pay debtor $10 million, which debtor will direct be paid to the Loan Creditors, reducing the Loan Creditors' secured claims against the estate, which are alleged to be approximately $124 million. The Loan Creditors will in return commit to support and vote in favor of debtor's proposed chapter 11 plan. Debtor and the Sponsor will release all other parties to the Sponsor Support Agreement from any claims relating to that agreement, and the Loan Creditors will release the Sponsor from any claims relating to that agreement. The Loan Creditors will not release debtor from any claims under the financing documents related to the loans they made, except that they will credit the $10 million payment from the Sponsor against amounts debtor owes to the Loan Creditors.

Fed. R. Bankr. P. 9019(a) provides that the court may approve a settlement or compromise on motion by the trustee (or the debtor in possession acting as trustee). Debtor, as the party proposing the compromise, has the burden to show that the compromise is fair and equitable and should be approved. In re A&C Properties, 784 F.2d 1377, 1381 (9th Cir. 1986). In considering whether to approve a compromise, the court must consider:

---

[1] Unless otherwise indicated, all chapter, section, and rule references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, and to the Federal Rules of Bankruptcy Procedure.

Page 2 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

> "(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises."

In re Woodson, 839 F.2d 610, 620 (quoting A&C Properties, 784 F.2d at 1381). "When assessing a compromise, courts need not rule upon disputed facts and questions of law, but rather only canvass the issues. A mini trial on the merits is not required." In re Schmitt, 215 B.R. 417, 423 (9th Cir. BAP 1997)(citations omitted).

1. UST's Objections

The UST raises three objections to the settlement.

(a) First, he argues that notice of the settlement was inadequate, because it was not served on all creditors as required by Fed. R. Bankr. P. 2002(a)(3). That rule requires 20 days notice to all creditors, as well as to other parties.

Debtor did not serve the notice on all creditors, but served it on the UST, Kelly, the Loan Creditors, the creditors requesting special notice, and the Sponsor. Debtor has attempted to remedy this defect by obtaining an order shortening time to 10 days, serving the notice on all creditors and giving a 10-day objection period, with the opportunity for a hearing if any creditors who did not get the original notice object within the 10 days.

The parties who have been active in this case got more than 20 days' notice of the hearing on the motion to settle. The procedure debtor adopted to get notice to all creditors gives 10 days for any previously un-noticed creditor to object before any order approving the settlement

Page 3 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

would be entered. None of those previously un-noticed parties have objected within the 10 days, nor has any of them sought additional time in which to object. I conclude that debtor's notice of the settlement was adequate.

(b) Second, the UST argues that the releases included in the settlement agreement are ambiguous, and possibly not reciprocal. There are two problems.

The language in the definition of "Released Claims" in Section 2.1 of the agreement is ambiguous. It first defines released claims as claims, "whether or not related to any of the agreements referenced in the recitals [which includes the Sponsor Support Agreement]," but then in the same sentence seems to limit "released claims" to those "arising out of, related to or pertaining to the Sponsor Support Agreement." The settling parties agree that "released claims" are claims relating to the Sponsor Support Agreement only. Debtor has indicated that it will clarify the language in the agreement to make that intent clear. The agreement approved by the court will need to remedy the ambiguity by limiting the released claims to only claims related to the Sponsor Support Agreement.

The second problem is that there is a typographical error in Section 2.2, titled "Release by Sponsor." The text of the section says that "Borrower" releases claims. Debtor acknowledges that this is a typographical error. The text should say that "Sponsor" releases claims. Debtor will make that change to the agreement.

The term "Borrower" is used again in section 2.3, titled "Release by Debtor." "Borrower" is nowhere defined in this agreement. Debtor says

Page 4 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

the term means "debtor," and that the agreement will be changed either to say that "debtor" releases the claims, or to define "Borrower" as debtor. That change will remedy the problem.

(c) The UST objects to Article IV of the settlement agreement, which is an agreement between the Loan Creditors and the Sponsor about what happens if debtor's chapter 11 plan is not confirmed. It provides that, if there is a chapter 7 liquidation or § 363 sale, and if the court allows the Loan Creditors to credit bid, the Sponsor may, upon payment of $3 million plus an amount sufficient to fund operations for six months into an escrow account, require the Loan Creditors to make the credit bid on the Sponsor's behalf. If the credit bid is successful, the Loan Creditors and Sponsor agree that the assets of debtor will be contributed to a special purpose entity that will be owned 80.1 percent by the Sponsor and 19.9 percent by the Loan Creditors.

The UST argues that this provision is an attempt to circumvent the sale requirements of the Bankruptcy Code.

I do not think this provision is an attempt to circumvent the sale requirements of the Code, in that the agreement is contingent on the court allowing a § 363 sale and, if there is such a sale, on the Loan Creditors being allowed to credit bid and the credit bid being successful. The parties agreed in open court that any sale would be subject to the requirements of § 363, including court approval.

This portion of the settlement agreement is actually an agreement between the Loan Creditors and the Sponsor, and does not involve debtor. Although I do not see this provision as circumventing the Code's sale provisions, I am not willing to enter an order approving what is

Page 5 -  MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

essentially a side agreement between non-debtor parties. Therefore, the order approving this settlement agreement shall make clear that my approval does not extend to Article IV of the agreement.

2. <u>Kelly Objections</u>

Kelly has a number of objections. Most of those objections flow from its argument that the settlement is based on the faulty premise that the Loan Creditors have a security interest in the payments the Sponsor is obligated to make under the Sponsor Support Agreement. The settling parties acknowledge that the settlement is based on their view that the Loan Creditors having a security interest in debtor's assets, including the Sponsor Support Claims and proceeds of any Sponsor Support Claims. The crucial question then is whether the Loan Creditors actually have that security interest.

(a) <u>Loan Creditors' Security Interest in Sponsor Support Agreement</u>

Debtor argues that the Loan Creditors have a first priority security interest in all of debtor's assets, including its accounts, inventory, accounts receivable and general intangibles, and the proceeds of those assets, and that claims and recoveries under the Sponsor Support Agreement are general intangibles.

The Loan Creditors provided financing under a Credit Agreement and an Assignment and Security Agreement. Section 2.01 of the Assignment and Security Agreement provides that the Loan Creditors have a security interest in debtor's "estate, right, title and interest in, to and under <u>all assets of [debtor], whether now owned or hereafter existing or acquired</u>," including a long list of types of collateral. Assignment and Security Agreement at Section 2.01 (emphasis supplied). The list

Page 6 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

includes a number of named agreements as well as inventory, accounts, contract rights, and "all general intangibles." § 2.01(a), (f), (g). It also includes the proceeds of all the assets. § 2.01(l).

Kelly points out that the Sponsor Support Agreement is not included in the list of contracts, agreements, and documents in which debtor granted a security interest, indicating that the parties did not intend to include rights under the Sponsor Support Agreement in the security interest. The Loan Creditors explain that it is customary for project financing transactions such as this one to list certain key Project Documents in the security document. But the Sponsor Support Agreement is not a Project Document, it is a financing document, and so it is not specifically listed.

This explanation is logical in the context of the security agreement. The contracts listed in Section 2.01(a) of the Assignment and Security Agreement appear to be project documents, not financing documents. There is no evidence to the contrary. Therefore, exclusion of the Sponsor Support Agreement from the list of documents in the Assignment and Security Agreement does not evidence an intention to carve out the Sponsor Security Agreement from "all assets" of debtor, which are subject to the security interest, nor exclude that agreement from the general intangibles that are specifically included.

Kelly also says that the Sponsor Support Agreement is not included in the list of documents that defines the term "Project Documents" in the Credit Agreement between debtor and the Loan Creditors. That omission is explained in the same way its omission is explained in the Assignment and Security Agreement; the Sponsor Support Agreement is a financing

Page 7 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

document, not a project document.

Kelly next argues that payments under the Sponsor Support Agreement are not part of the Loan Creditors' security, because those payments are by agreement earmarked for a particular use.

The Sponsor Support Agreement obligates the Sponsor to make certain contributions on the occurrence of certain funding deficiencies by debtor. Those proceeds are required to be deposited into specified accounts and applied by debtor "solely" for the payment of specified costs. Sponsor Support Agreement at § 2.03(b) (Project Completion Deficiencies), § 4.04(b) (Soil Stabilization Deficiencies), and § 5.03(b) (Contingency Deficiencies). Kelly argues that this earmarking shows that the Loan Creditors do not have a security interest in the contributions, because those contributions must be used for the specified purpose.

Kelly fails to note, however, that the Assignment and Security Agreement allows the Loan Creditors to cause all pledged revenue and moneys "to be paid and/or delivered directly to it" upon a "Security Event of Default." Assignment and Security Agreement at § 6.01(b). A "Security Event of Default" is defined with reference to the Credit Agreement. Id. at p.3. The Credit Agreement defines "Events of Default" to include default by any "Loan Party"[2] of any obligations under Sections 2.02(b) or 3.02 of the Sponsor Support Agreement. Credit Agreement at § 8.01(c). The Sponsor is obligated under section 2.02(b) to make contribution if there is a deficiency in project completion funding, and

---

[2] "Loan Party" is defined as "the Borrower, the Pledgor, and any Affiliates thereof that are party to any Financing Document." Credit Agreement at 29. "Financing Documents" includes the Sponsor Support Agreement. Id. at 22.

Page 8 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

under section 3.02 to make contribution if there is what is termed an Oregon Loan Deficiency. Thus, the Assignment and Security Agreement, which was executed at the same time as the Sponsor Support Agreement, provides for direct payment to the Loan Creditors in the event of certain defaults.

The Loan Creditors also point out that, under the Accounts Agreement, the Collateral Agent for the Loan Creditors may upon certain defaults suspend the rights of debtor to withdraw any funds from the Project Account without the consent of the Collateral Agent, and may collect all funds in which debtor has an interest. Accounts Agreement at § 17.01. The Notice of Suspension that triggers this restriction was given to debtor in December 2008.

These provisions support rather than defeat a conclusion that the parties intended the Loan Creditors to have a security interest in the proceeds of the Sponsor Support Agreement.

There is no dispute that the Loan Creditors filed a UCC financing statement with the State of Oregon, showing that they hold a security interest in all assets of debtor. I conclude, based on the agreements in evidence, that the Loan Creditors have a security interest in debtor's rights under the Sponsor Support Agreement. Kelly's argument to the contrary fails.

(b) <u>Consideration for Settlement Agreement</u>

Next, Kelly argues that debtor receives no consideration under the Settlement Agreement, arguing that the only possible benefits debtor could gain are saved litigation costs and the Loan Creditors' commitment to vote in favor of the chapter 11 plan. It claims that debtor is

Page 9 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

totally abandoning millions of dollars of claims against the Sponsor and getting very little, if anything, in return.

The agreement provides that the Sponsor will pay debtor $10 million, which debtor will in turn direct to be paid for the benefit of the Loan Creditors. In return, the Loan Creditors will credit the $10 million to what debtor owes, and support the plan. Settlement Agreement at §§ 1.1, 2.4, 3.2. According to the Loan Creditors, the plan provides for satisfaction of the Loan Creditors' $124 million secured claim by payment of $3 million. In addition, the agreement helps debtor's balance sheet and facilitates new funding from the Sponsor. It also resolves the disputes between debtor and the Sponsor.

There is consideration for the settlement agreement. Although the settlement primarily affects the Loan Creditors and the Sponsor, debtor gets payment on its debt to the Loan Creditors, who have a security interest in all of debtor's assets, plus their support of the plan, which would satisfy the $124 million debt to the Loan Creditors for $3 million, plus the $10 million the Loan Creditors will receive from the Sponsor's settlement payment.

(c) <u>Legal Standard for Approval of Settlement</u>

Debtor urges approval of the settlement, applying the four-factor test set out in <u>Woodson</u> for consideration of settlements under Fed. R. Civ. P. 9019. Kelly argues that debtor's Rule 9019 analysis misrepresents and misapplies the test to be applied to approval of settlements in the context of a plan of reorganization. It argues that the question is whether the settlement is fair and equitable, an analysis that is "wholly independent from, and supreme to, the secondary" four-

factor <u>Woodson</u> test. JH Kelly Objection to Debtor's Motion for Approval of Settlement at 5. Relying on <u>In re Iridium Operating LLC</u>, 478 F.3d 452 (2d Cir. 2007), it urges this court to focus on whether the settlement conforms to the absolute priority rule rather than whether it satisfies the four-factor <u>Woodson</u> test.

Kelly is wrong about the test. First, this is not approval of a settlement in the context of approving a plan of reorganization. If it were, the absolute priority rule would be implicated in considering the plan, not the settlement agreement.

Second, <u>Woodson</u> did not say that the four-factor test is separate and apart from the "fair and equitable" test. The Ninth Circuit said:

> The court may approve a compromise only if it is 'fair and equitable.' Moreover, in passing on the proposed compromise, the court must consider:
>
> > '(a) The probability of success in the litigation; (b) the difficulties, if any, to be encountered in the matter of collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; (d) the paramount interest of the creditors and a proper deference to their reasonable views in the premises.'

839 F.2d at 620 (quoting <u>A&C Properties</u>, 784 F.2d at 1381). Kelly reads the court's "moreover" language as imposing a separate, independent test in addition to the question of whether the settlement is fair and equitable. But the <u>Woodson</u> test comes from <u>A&C Properties</u>, and it is clear from that case that the four factors are used to determine whether the compromise is fair and equitable. In <u>A&C Properties</u>, the court said:

> It is clear that there must be more than a mere good faith negotiation of a settlement by the trustee in order for the bankruptcy court to affirm a compromise agreement. The court must also find that the compromise is fair and equitable.

In determining the fairness, reasonableness and adequacy of a proposed settlement agreement, the court must consider [the four factors].

784 F.2d at 1381 (citations omitted). The four factors are to be considered in determining whether the compromise is fair and equitable, not independently of the fair and equitable requirement.

The case on which Kelly relies, <u>Iridium</u>, involved a request for court approval of a pre-plan settlement that involved the distribution of estate assets to creditors. The Second Circuit concluded that, where a settlement is not a part of a plan of reorganization, the absolute priority rule is not necessarily implicated, as it would be if the settlement were part of a reorganization plan. When the settlement is presented apart from the plan, the court recognized a heightened risk that the parties to the settlement would collude to favor junior classes of creditors over senior classes of creditors. In order to address that risk, the court said:

> In the Chapter 11 context, whether a settlement's distribution plan complies with the Bankruptcy Code's priority scheme will often be the dispositive factor. However, where the remaining factors weigh heavily in favor of approving a settlement, the bankruptcy court, in its discretion, could endorse a settlement that does not comply in some minor respects with the priority rule if the parties to the settlement justify, and the reviewing court clearly articulates the reasons for approving, a settlement that deviates from the priority rule.

478 F.3d at 464-65.

The Ninth Circuit has not adopted the Second Circuit's rule that requires compliance with the absolute priority rule as the paramount concern. In this circuit, we apply the test in <u>Woodson</u> to determine whether a settlement is fair and equitable. The fourth factor of that test, the interests of creditors, takes into account the treatment

Page 12 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

creditors will receive if the settlement is approved, including if applicable whether any distribution would violate the priority rules of the Code.

In any event, this settlement does not discriminate unfairly or violate the absolute priority rule. Kelly's argument that this agreement allows the Sponsor to "artificially create a wholly separate 'secured' class for the Loan Creditors" can only be based on Kelly's argument, which I have rejected, that the Loan Creditors are not secured. Their claims are secured, and therefore there is no artificial class of secured creditors being created here. Kelly does not explain how its asserted first priority lien on the real property and improvements will be hurt by this settlement, which will result in at least a partial satisfaction of the Loan Creditors' secured claims.

Kelly argues that the settlement violates the absolute priority rule, because the Sponsor is buying an 81% interest in the reorganized debtor, thereby retaining an equity interest in debtor ahead of Kelly, who is undersecured.

This settlement does not result in the Sponsor obtaining any interest in the debtor. The Sponsor is agreeing to a process to be applied in case the plan fails and there is a § 363 sale.

Kelly also argues that this is an invalid *sub rosa* plan, which circumvents the plan confirmation process. This settlement does not circumvent the plan process. It requires the Loan Creditors to vote in favor of the plan that has already been proposed. This settlement, if approved, will go into effect whether or not the plan is confirmed. Plan confirmation issues should and will be dealt with during the plan

Page 13 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

confirmation process.  The focus here is on whether to approve the
settlement.  Although the settlement is critical to plan confirmation, in
that debtor will not be able to go forward with its plan if this
settlement is not approved, the settlement is not in reality the plan.
It is possible that the plan will not be confirmed, even if the
settlement is approved and implemented.

Kelly also asserts that the settlement results in debtor waiving its
preference claims.  As discussed above, the parties have clarified, and
will assure that the settlement agreement reflects, that the only claims
being released are those relating to the Sponsor Support Agreement.

### (d) Application of Woodson Factors

#### (1) Probability of success in the litigation

Kelly argues that debtor gets nothing from the settlement but gives
up potential claims.  It does not discuss debtor's probability of success
in any litigation against the Sponsor under the Sponsor Support
Agreement, but merely says that there must be some probability of
success.

Debtor explains that the Sponsor Support Agreement is complex and
subject to varying interpretations.  The parties dispute the extent of
the Sponsor's obligation to make payments, including whether certain
events triggering that obligation have occurred.  Debtor's CEO testified
that the Sponsor has indicated that it has defenses that it would assert
to any claims debtor might make.  In addition, if debtor were to prevail
in its claims against the Sponsor, the proceeds of that litigation would
flow to the Loan Creditors, not to the estate for the benefit of
unsecured creditors.  Although the likelihood of success of litigation

Page 14 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

between debtor and the Sponsor is unclear, the Sponsor Support Agreement is complex, litigation would undoubtedly be expensive, and any recovery would benefit the Loan Creditors, not the estate.

(2) Difficulties in collection

No difficulties in collection are identified. Kelly does not dispute that there would be no problems with collection.

(3) Complexity of the litigation and expense, inconvenience, and delay

Kelly says that debtor, because it is controlled by the Sponsor, has not undertaken any analysis about the expense, inconvenience, or delay that would be involved in litigating against the Sponsor. Debtor and the Loan Creditors point out that this would be costly, multi-party litigation, with an unknown outcome. I agree that the litigation would be complex, time-consuming, and expensive.

(4) Interests of creditors

Kelly argues that the Settlement Agreement completely disregards the views of other creditors, violates the Code's priority rules, diverts significant value away from the estate into the hands of second-priority, if not wholly unsecured, creditors, and circumvents the plan confirmation process. Debtor argues that the interests of creditors are being protected by resolving these disputes among debtor, the Loan Creditors, and the Sponsor, resulting in a substantial payment from the Sponsor that will reduce the amount of the claim of the Loan Creditors and free up resources for resuming operations.

Kelly's argument is based on its erroneous view of the secured status of the Loan Creditors and the consequences of settling or not

Page 15 - MEMORANDUM OPINION RE MOTION FOR APPROVAL OF SETTLEMENT

settling the claims relating to the Sponsor Support Agreement. Because of Kelly's erroneous view of the secured status of the Loan Creditors and of the consequences of settlement, including the fact that it is not in fact the plan of reorganization, its arguments about eviscerating the priorities set by the Bankruptcy Code and circumventing the plan process fail.

This settlement will resolve potentially costly litigation with the Sponsor and the Loan Creditors, and will pave the way to provide debtor with relief from a $124 million obligation to the Loan Creditors. It will also pave the way to reorganization and the eventual restarting of production of ethanol. This was a negotiation among parties with varying interests. Debtor has demonstrated that the settlement will benefit the estate by eliminating potential litigation and a large secured (and likely large undersecured) debt. Debtor has not disregarded the interests of Kelly in this settlement, but has found a resolution with the Loan Creditors and Sponsor that will benefit everyone if the settlement is approved and the plan, which is contingent on the settlement, can be approved.

## CONCLUSION

I conclude that debtor has demonstrated that this settlement is fair and equitable. I will approve it, subject to the few changes I discussed above. Mr. Pahl should submit the order.